UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

HERMAN SAHAN,                                    :
                                                 :
                          Plaintiff,             :      Case No.: 1:20-CV-03069-VSB
                                                 :
            -against-                            :      SECOND AMENDED COMPLAINT
                                                 :
TETRAPHASE PHARMACEUTICALS, INC.,                :      DEMAND FOR JURY TRIAL
L. PATRICK GAGE, GAREN BOHLIN,                   :
JEFFREY A. CHODAKEWITZ, JOHN G.                  :
FREUND, GERRI HENWOOD, GUY                       :
MACDONALD, and NANCY J. WYSENSKI,                :
                                                 :
                          Defendants.            :

\- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## SECOND AMENDED COMPLAINT

Plaintiff Herman Sahan ("Plaintiff"), by his undersigned attorneys, for this second amended complaint (the "Complaint") against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Tetraphase Pharmaceuticals, Inc. ("Tetraphase" or the "Company") and its board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Tetraphase, the "Defendants"), arising out of Defendants' sustained attempts to sell the Company in violation of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9"), and for breaching their fiduciary duty of candor under the laws of Delaware State.

1

2.      On March 15, 2020, Tetraphase entered into an agreement and plan of merger with AcelRx Pharmaceuticals, Inc. ("AcelRx") and its subsidiaries (the "AcelRX Merger"). In soliciting shareholder approval for the AcelRX Merger, on April 6, 2020, Defendants authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "Registration Statement") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and Delaware law.

3.      Shortly thereafter, on April 16, 2020, Plaintiff filed suit challenging the AcelRx Merger and alleging material deficiencies in the Registration Statement. Undeterred by Plaintiff's suit, on April 21, 2020, Defendants authorized an amended registration statement (the "Amended Registration Statement") that refrained from disclosing the information sought by Plaintiff.

4.      The AcelRx Merger failed to maximize value for shareholders, as evidenced by the superior offer made for the Company by Melinta Therapeutics, Inc. and its subsidiary ("Melinta"). On June 4, 2020, the Board terminated the AcelRX Merger and entered into an agreement and plan of merger with Melinta (the "Melinta Merger"). This time, Tetraphase structured the transaction as a tender offer, presumably to expedite the process. On June 12, 2020, Defendants issued a Form Schedule 14D-9 Recommendation Statement (the "Melinta Recommendation Statement") which omitted substantially similar information necessary for shareholders to determine whether a sale of the Company was in their best interests and whether the consideration offered was fair and maximized the value of their shares.

5.      In light of the changing deal and failure to adequately disclose material information to shareholders in the Melinta Recommendation Statement, on June 16, 2020, Plaintiff amended his complaint and reasserted substantially similar allegations.

6.     Yet, perhaps as *prima facie* evidence of the Board's failure to maximize shareholder value, for the second time, a superior offer would be made for the Company. On June 24, 2020, the Board terminated the Melinta Merger and entered into an agreement and plan of merger (the "Merger Agreement") with La Jolla Pharmaceutical Company ("La Jolla") and its subsidiary (the "Tender Offer" or "Proposed Transaction").

7.     Pursuant to the Merger Agreement, TTP Merger Sub, Inc., a Delaware corporation (a wholly owned subsidiary of La Jolla), issued a tender offer to purchase all of the issued and outstanding shares of Tetraphase common stock for: (1) $2.00 per Share (the "Cash Consideration"), to the holder in cash, without interest and less any applicable withholding taxes, plus (2) one contingent value right ("CVR") representing the right to receive certain consideration based on the achievement of net sales milestones, in an aggregate amount of up to $16.0 million, payable in cash, without interest and net of applicable withholding taxes (the Cash Consideration plus one CVR is referred to as the "Offer Price").

8.     On June 29, 2020, in order to convince Tetraphase's public common stockholders to tender their shares, the Defendants issued another Form Schedule 14D-9 Recommendation Statement (the "Recommendation Statement") with the SEC, omitting substantially the same information that was previously omitted in the Registration Statement, Amended Registration Statement, and Melinta Recommendation Statement. Defendants having, not once, not twice, but *three times* recommended that shareholders approve deals offering substantially less consideration for their shares now ask, once again, that shareholders tender their shares without providing them with material information necessary to fully understand their shares' intrinsic value.

9.     The Tender Offer is initially set to expire at one minute after 11:59 p.m., Eastern Time, on July 28, 2020 (the "Expiration Time"). It is imperative that the material information

which has been omitted from the Recommendation Statement is disclosed to the Company's stockholders prior to the Expiration Time so they can properly determine whether to tender their shares. Therefore, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Tender Offer unless and until the material information discussed below is disclosed to Tetraphase's stockholders sufficiently in advance of the Expiration Time or, in the event the Tender Offer is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act and Delaware law.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule 14d-9. This Court also has jurisdiction over the duty of candor claim pursuant to 28 U.S.C. § 1367.

11.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

12.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391 because Defendants are found or are inhabitants or transact business in this District.  Indeed, Tetraphase's common stock trades on the Nasdaq Global Select Market ("NasdaqGS"), which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

13.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Tetraphase common stock.

14.     Defendant Tetraphase is a public company incorporated under the laws of Delaware with principal executive offices located at 480 Arsenal Way, Watertown, MA 02472.  Tetraphase's common stock is traded on the NasdaqGS under the ticker symbol "TTPH."

15.     Defendant L. Patrick Gage is, and has been at all relevant times, a director of the Company and Chairman of the Board.

16.     Defendant Guy Macdonald is, and has been at all relevant times, a director of the Company and Chief Executive Officer.

17.     Defendant Garen Bohlin is, and has been at all relevant times, a director of the Company.

18.     Defendant Jeffrey Chodakewitz is, and has been at all relevant times, a director of the Company.

19.     Defendant John G. Freund is, and has been at all relevant times, a director of the Company.

20.     Defendant Gerri Henwood is, and has been at all relevant times, a director of the Company.

21.     Defendant Nancy J. Wysenski is, and has been at all relevant times, a director of the Company.

22.     The Defendants identified in paragraphs 15 through 21 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Tetraphase, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the Tender Offer

23.     Tetraphase is a biopharmaceutical company that develops a variety of antibiotics that treat serious and life-threatening multidrug-resistant infections. The company's lead product is XERAVA which is specifically designed to treat bacterial infections that are resistant to the current standard treatments (multi-drug resistance). Antibiotic resistant infections affect about 2 million Americans each year, and the rate is expected to increase. Tetraphase received FDA approval for XERAVA in late August 2018, and in Europe in September of 2018.

24.     La Jolla is a biopharmaceutical company which focuses on the discovery, development, and commercialization of therapeutics for life-threatening diseases. The company offers GIAPREZA, a medication indicated to increase blood pressure in adults with septic or other distributive shock. It is also developing LJPC-0118 for the treatment of severe malaria; and LJPC-401 (synthetic human hepcidin), an investigational product to treat conditions characterized by iron overload. La Jolla is headquartered in San Diego, California.

25.     According to the June 24, 2020, press release announcing the Tender Offer:

**La Jolla Pharmaceutical Company to Acquire
Tetraphase Pharmaceuticals, Inc.**

SAN DIEGO & WATERTOWN, Mass.--(BUSINESS WIRE)--Jun. 24, 2020-- La Jolla Pharmaceutical Company, which is dedicated to the development and commercialization of innovative therapies that improve outcomes in patients

suffering from life-threatening diseases, and Tetraphase Pharmaceuticals, Inc. (Nasdaq: TTPH), a biopharmaceutical company focused on commercializing its novel tetracycline XERAVA™ to treat serious and life-threatening infections, today announced that they have entered into a definitive merger agreement. Under the terms of the definitive merger agreement, La Jolla would acquire Tetraphase, through a tender offer, for $43.0 million in upfront cash plus potential future cash payments of up to $16.0 million pursuant to contingent value rights (CVRs). The Board of Directors of Tetraphase unanimously recommends that stockholders tender their shares in the La Jolla tender offer once it is commenced.

Under the terms of the definitive merger agreement, the upfront cash consideration in the transaction will be as follows: (i) $2.00 per share of Tetraphase common stock (including common stock underlying restricted stock units, performance-based stock units and pre-funded warrants); (ii) $2.68 per share of Tetraphase common stock underlying the common stock warrants issued by Tetraphase in November 2019; and (iii) $2.69 per share of Tetraphase common stock underlying the common stock warrants issued by Tetraphase in January 2020. **Tetraphase equity holders would also be entitled to receive, for each share of Tetraphase common stock, one non-tradeable CVR. The holders of the CVRs would be entitled to receive payments of up to an additional** $16.0 million in the aggregate upon the achievement of certain net sales of XERAVA™ in the United States (U.S.) as follows: (i) $2.5 million if 2021 XERAVA U.S. net sales are ≥ $20 million; (ii) $4.5 million if XERAVA U.S. net sales are ≥ $35 million during any calendar year ending on or prior to December 31, 2024; and (iii) $9.0 million if XERAVA U.S. net sales are ≥ $55 million during any calendar year ending on or prior to December 31, 2024.

"Combining with La Jolla, which markets GIAPREZA, the first new treatment for patients suffering from septic or other distributive shock in more than a decade, should help accelerate XERAVA's availability to patients in need," said Larry Edwards, President and Chief Executive Officer of Tetraphase. "We are excited to have the opportunity to combine with a company that has a strategic vision similar to our own."

"We commend Tetraphase on its successful commercial launch of XERAVA, an important new treatment for patients suffering from serious infections," said Kevin Tang, Chairman of La Jolla. "By increasing our presence in the hospital with a second innovative therapy, we look forward to better serving the needs of patients suffering from life-threatening diseases."

Under the terms of the definitive merger agreement, the tender offer will commence within three business days. Any shares not tendered in the tender offer will be acquired in a second-step merger at the same cash price as paid in the tender offer. Closing of the transaction is subject to specified closing conditions, including that a majority of Tetraphase's shares of common stock (treating the shares underlying Tetraphase's RSUs and PRSUs as outstanding) are validly tendered and not validly

withdrawn. Upon the closing of the transactions, Tetraphase will become a wholly owned subsidiary of La Jolla, and shares of Tetraphase's common stock will no longer be listed on any public market. Subject to certain limited exceptions, the CVRs will be non-transferable.

The transaction was unanimously approved by the Tetraphase board of directors and is expected to close in the third quarter of 2020. Certain Tetraphase stockholders and warrant holders, including Armistice Capital, LLC, holding in the aggregate approximately 20% of Tetraphase's outstanding voting power, have signed support agreements or exchange agreements under which such equity holders agreed, among other things, to tender their shares in the tender offer and to the treatment of the warrants described above. Additionally, La Jolla owns shares in Tetraphase that represent approximately 15% of Tetraphase's outstanding voting power.

On June 24, 2020, Tetraphase terminated its previously announced merger agreement with Melinta Therapeutics, Inc., dated as of June 4, 2020, in order to enter into the definitive merger agreement with La Jolla. In connection with the termination of the definitive merger agreement with Melinta, Tetraphase paid Melinta a termination fee in the amount of $1,150,000.

Janney Montgomery Scott is acting as financial advisor to Tetraphase and has rendered a fairness opinion to Tetraphase's board of directors in connection with the transaction. Wilmer Cutler Pickering Hale and Dorr LLP is acting as legal advisor to Tetraphase in connection with the transaction.

26.     This Tender Offer comes in the midst of the COVID-19 pandemic ("Pandemic"), at a time when stocks throughout the world are subject to great uncertainty and radical economic change. Prior to the Pandemic, the Company was trading as high as $3.84 per share. The Cash Consideration only offers shareholders a mere $2.00 per share—even though in the day prior to the announcement of the Tender Offer the stock was trading at $2.77 per share—meaning the market is valuing the Company at a ***38.5% premium*** to the Cash Consideration. The Offer Price does not even purport to compensate stockholders for what they can sell their shares for on the market.

27.     Especially egregious is that the CVR is unlikely, or at least at risk, of materializing. Per the Merger Agreement, the CVR will only be incrementally paid should XERAVA hit certain

milestones: (1) an aggregate amount of $2.5 million on December 31, 2021, (2) an aggregate amount of $4.5 million on December 31, 2024 and (3) an aggregate amount of $9.0 million on December 31, 2024. However, as can be seen from the chart below, those sales milestones will require significant sales growth.

|  | XERAVA sales |
|---|---|
| 4th Quarter 2018 | $178.000 |
| 1st Quarter 2019 | $341.000 |
| 2nd Quarter 2019 | $796.000 |
| 3rd Quarter 2019 | $978.000 |
| 4th Quarter 2019 | $1.460.000 |
| 1st Quarter 2020 | $1.755.000 |

As such, considering the Cash Consideration represents a 38.5% discount to La Jolla and the CVR is an inherent rolling-of-the-dice, the Offer Price does not compensate shareholders for the intrinsic value of their shares, nor even their current value.

28.     And so, piggybacking off the uncertainty of Pandemic, the Tender Offer will provide a substantial discount to La Jolla, at the expense of the common stockholders who will not see the intrinsic value of their shares realized nor be able to partake in the continued growth of the Company. Therefore, it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Recommendation Statement, which is necessary for stockholders to properly determine whether to tender their shares.

**The Recommendation Statement Omits Material Information**

29.     On June 29, 2020, Defendants filed a materially incomplete and misleading Recommendation Statement with the SEC. The Individual Defendants were obligated to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Recommendation Statement omits material information that is necessary

for the Company's stockholders to decide whether to tender their shares.

30.      *First*, the Recommendation Statement contains materially false or misleading statements and omits certain material information concerning the Company's projected financial information.

31.      In evaluating a sale of the Company, management prepared projections to evaluate Tetraphase as a standalone Company, which were "relied upon by Janney Montgomery Scott, LLC ("Janney") for purposes of its opinion and by the Tetraphase Board in connection with its consideration of the [Proposed Transaction]." Rec. Stmt. at 51. Management prepared two sets of projections: the *Tetraphase Base Case* projections, which were used by Janney in its financial analyses, and the *Tetraphase Upside Case*. *See id.* at 52.

32.      While both the Registration Statement and Recommendation Statement stated, "Tetraphase does not intend to, and disclaims any obligation to, update, correct, or otherwise revise the management projections to reflect circumstances existing or arising after the date the management projections were generated or to reflect the occurrence of future events" that is a misleading statement, as the *Tetraphase Base Case* was nevertheless updated to reflect changes in the projections for the second half of 2020 (the "2020 Update"). *Id.* The 2020 Update projects Total Revenue in the amount of $9.8 million for the second half of 2020, accounting for 67.6% of the $14.5 million in projected Total Revenue for 2020 as disclosed in the previously filed Registration Statement. Despite the Pandemic, it appears Tetraphase sales are either on track or improving.

33.      Yet, there is no similar update disclosed for the *Tetraphase Upside Case*. Indeed, other than the 2020 Update and projecting sales of XERAVA, the Recommendation Statement fails to disclose updates to the other financial metrics, as well as disclosing whether potential

counterparties have been provided with more recent management projections. Similarly, and as Plaintiff has repeatedly demanded, the Recommendation Statement omits: (i) which case management believed was more likely to occur; (ii) the date each set of projections was created; (iii) the reasons why only the base case was provided to Janney; and (iv) which cases were provided to interested parties. The disclosure of information concerning the different management cases, and any updates thereto, certainly alter the 'total mix' of information available to shareholders because it provides them with the full valuation picture and so must be disclosed.

34.     Furthermore, for both sets of projections, the Recommendation Statement omits the line-items used to calculate unlevered free cash flow, including: (i) depreciation; (ii) non-cash adjustments; (iii) capital expenditures; (iv) working capital; and (v) the reasons why the impact of net operating losses and stock-based compensation expense were excluded. This information must be disclosed as Janney relied upon the unlevered free cash flows in its *Discounted Cash Flow Analysis*.

35.     Shareholders have now been presented with, and asked to ratify, ***three different agreements and plans of merger***. Each new deal has presented a drastically different valuation picture of the Company. Now, with the market value of the stock trading above the Offer Price, it is all the more crucial that shareholders are provided with a complete disclosure of the financial projections to determine whether the Offer Price represents fair value. Concerning future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, Inc.*, 916 F.3d 1121 (8th Cir. 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).

36.     **Second**, the Recommendation Statement omits material information regarding the financial analyses conducted by Janney. This is of the utmost importance as Janney appears to be inclined to hand out fairness recommendations without due regard to shareholders.

37.     With respect to Janney's *Tetraphase Discounted Cash Flow Analysis*, the Recommendation Statement  is materially misleading and incomplete because it fails to disclose (i) all line items used to calculate unlevered free cash flow, as described above; (ii) Janney's basis for using an Enterprise Value/Revenue exit multiple range of 2.25x to 2.75x; (iii) the reasons $15.0 million was utilized for Net Cash, instead of $26.1 million or $0 as utilized in the *Selected Precedent Transaction Analysis*; and (iv) the basis for forecasting a need of $41.4 million equity financing.

38.     Most importantly, the Recommendation Statement fails to fully disclose Janney's inputs for selecting a discount rate range of 17.8% to 21.8% as utilized in calculating the implied equity value of the Offer Price and as applied in its *Discounted Cash Flow Analysis*. The Recommendation Statement qualitatively describes the arriving at this range as follows:

> The range of discount rates was derived based on Tetraphase's assumed weighted average cost of capital under the capital asset pricing model based on Janney's experience and professional judgment and included assumptions regarding post-tax cost of debt, market risk premium, equity size premium, risk free rate, beta (which was based on a re-levered adjusted beta of selected public companies in the healthcare space with similar characteristics to Tetraphase, including but not limited to anti-bacterial drug focus and similar operating metrics) and debt to total capitalization.

Rec. Stmt. at 46. Without the quantitative inputs and variables which Janney utilized, the Company's stockholders cannot evaluate for themselves the reliability of Janney's analyses.

39.     As one highly respected law professor explained regarding these crucial inputs, in a financial analysis for a fairness opinion a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M.

Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).   Therefore, shareholders need this information to make a meaningful determination whether the implied equity value reflects the value of Tetraphase or else was the result of an unreasonable judgment by Janney.

40.     With respect to Janney's *Precedent Transaction Analysis,* the Recommendation Statement fails to disclose: (i) Janney's basis and assumptions for selecting each of the transactions observed; (ii) the inputs and individual metrics for each of the transactions observed; (iii) Janney's assumptions for selecting revenue multiples of 2.0x to 4.5x; and (iv) Janney's basis for providing two different scenarios for cash assumptions, when it had simply utilized a $15.0 million Net Cash balance in its *Discounted Cash Flow Analysis*.

41.     With respect to Janney's *Premium Paid Analysis,* the Recommendation Statement fails to disclose; (i) the identity of each transaction observed; (ii) the premiums paid for each transaction and (iii) the basis of selecting the 30 healthcare transactions with an enterprise value of less than $500 Million.

42.     With respect to Janney's *Selected Public Companies Analysis*, the Recommendation Statement *must* disclose: (i) the results of the analysis, including the implied range of equity values derived from the analysis; (ii) Janney's basis assumptions for selecting each of the companies observed; (iii) the individual metrics for each company observed; and (iv) the enterprise values for each company observed.

43.     Considering shareholders have been informed by Janney that each deal represented adequate value for their shares, and that each time a better deal was forthcoming, shareholders need access to this crucial information. As Professor Davidoff explains:

> A fairness opinion's worth ultimately lies in the reliability and accuracy of its underlying valuation analyses. This is the realm of finance - and academics have made significant strides in the previous decades to develop techniques by which a theoretically reliable range of values can be achieved. However, there is still an element of subjectivity present in the choice and application of these methods. The end-result is to provide the preparer discretion to effect the outcome of a valuation and a diminished ability for outsiders to make comparative assessments of analyses.

> There are a number of different underlying valuation analyses upon which a fairness opinion can rest. The most common and accepted techniques are discounted cash flow, comparable companies, premium, break-up, and liquidation analysis. The preparer of a fairness opinion will typically utilize a weighted combination of these to arrive at a fairness conclusion. The choice of a particular analysis to employ and the weight given to each is partially subjective and depends upon the asset being valued and the relevant circumstances. For example, in the corporate control transaction paradigm the most important analysis is, absent unusual circumstances, the discounted cash flow calculus. However, in the investment banking community, there are no uniform, specific, and objective guidelines as to the exact mix and weight to assign to each of these methods to arrive at fairness.

> Each of the techniques in and of themselves is also prone to subjectivity. For example, a discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices, which must be made, each of which can significantly affect the final valuation. These are the correct forecasted free cash flows to utilize, the appropriate discount rate, and the terminal value of the asset.

*Fairness Opinions*, 55 Am. U. L. Rev. at 1573-78.

44.     **Third**, the Recommendation omits material information concerning the compensation which the Individual Defendants stand to receive in the Tender Offer. While page 9 of the Recommendation Statement provides a table setting forth the aggregate cash and contingent consideration payable to the Individual Defendants at the Offer Price, it fails to include "Tetraphase Options, Tetraphase RSUs and Tetraphase PRSUs" for the Board. It is of the utmost importance that stockholders have full knowledge of the compensation stood to be received by the Individual Defendants in the transaction, in order to assess whether the Offer Price is truly fair. It would certainly alter the 'total mix' of information available to stockholders if they were aware that those recommending to tender had their own unique financial motivations for that recommendation.

45.     **Fourth and finally**, the Recommendation Statement fails to disclose the details of the Company's engagement of the other financial advisors retained in connection with the sales process, referred to as "Financial Advisor A," "Financial Advisor B," and "Financial Advisor C" (the "Additional Financial Advisors"). With respect to the Additional Financial Advisors the Recommendation Statement fails to disclose (i) the amount of compensation the Additional Financial Advisors have received or will receive in connection with their respective engagements by the Company, (ii) the amount of the Additional Financial Advisors compensation that is contingent upon the consummation of the Tender Offer, (iii) whether the Additional Financial Advisors have performed past services for any parties to the Tender Offer and/or their affiliates, including the timing and nature of those services and the amount of compensation received for providing such services, and (iv) their identity.

46.     In sum, the omission of the above-referenced information renders the Recommendation Statement materially incomplete and misleading, in contravention of the

Exchange Act and state law. Absent disclosure of the foregoing material information prior to the upcoming special meeting of the Company's stockholders, Plaintiff will be unable to make an informed decision regarding whether to tender his shares, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### Against All Defendants for Violation of Section 14(e) of the Exchange Act

47.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

49.     Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.     The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the Tender Offer and the intrinsic value of the Company.

51.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e). The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

52.     The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares. In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

53.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.   Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Tender Offer, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

54.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Time.

## COUNT II

**Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act
and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9**

55.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

56.     Defendants have caused the Recommendation Statement to be issued with the

intention of soliciting stockholder support of the Tender Offer.

57.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder

require full and complete disclosure in connection with tender offers. Specifically, Section

14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or
> reject a tender offer or request or invitation for tenders shall be made in accordance
> with such rules and regulations as the Commission may prescribe as necessary or
> appropriate in the public interest or for the protection of investors.

58.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the

Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or
> recommendation to holders of a class of securities referred to in section 14(d)(1) of
> the Act with respect to a tender offer for such securities shall include the name of
> the person making such solicitation or recommendation and the information
> required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and
> adequate summary thereof.

59.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's

directors to:

> Furnish such additional information, if any, as may be necessary to make the
> required statements, in light of the circumstances under which they are made, not
> materially misleading.

60.     The omission of information from a recommendation statement will violate Section

14(d)(4) and Rule 14d-9(d) if other SEC regulations specifically require disclosure of the omitted

information.

61.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Tender Offer, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

62.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Time.

## COUNT III

### Against all Defendants for Violations of Section 20(a) of the Exchange Act

63.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of Stemline within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Stemline, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company,

including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

65.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Recommendation Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Tender Offer. They were thus directly involved in preparing the Recommendation Statement.

67.     In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Tender Offer. The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

68.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

69.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and

proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

70.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT IV

### (Against the Individual Defendants for Breach of Their
### Fiduciary Duty of Candor/Disclosure)

71.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.     By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they sought stockholder action, and to ensure that the Recommendation Statement did not omit any material information or contain any materially misleading statements.

73.     As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving and/or causing the materially deficient Recommendation Statement to be disseminated to Plaintiff and the Company's other public stockholders.

74.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Tender Offer, unless

and until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

      B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

      C.      Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

      D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: July 2, 2020                 **MONTEVERDE & ASSOCIATES PC**

                           By:   */s/ Juan E. Monteverde*
                                Juan E. Monteverde (JM-8169)
                                The Empire State Building 350 Fifth Avenue, Suite 4405 New York, NY 10118
                                Tel:(212) 971-1341
                                Fax:(212) 202-7880
                                Email: jmonteverde@monteverdelaw.com

                                *Attorneys for Plaintiff*